# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DARRELL BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00782-TWP-MKK |
| | ) | |
| JASON CARTER Individual Capacity, | ) | |
| KELLY WILLIAMS Individual Capacity, | ) | |
| SHELLY JACOBS Individual Capacity, | ) | |
| CENTURION, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT, AND RESOLVING PENDING MOTIONS

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Jason Carter ("Dr. Carter"), Kelly Williams ("NP Williams"), Shelly Jacobs ("Ms. Jacobs"), and Centurion Health Services, LLC ("Centurion"), (collectively, the "Defendants") (Dkt. 93), and a Cross-Motion for Summary Judgment, filed by *pro se* Plaintiff Darrell Brown ("Mr. Brown") (Dkt. 98). Also pending are Mr. Brown's four requests for preliminary injunction, (Dkts. 67, 75, 120, 124), a Motion to Appoint Counsel, (Dkt. 114), a Motion for Leave to Supplement his Motion for Summary Judgment, (Dkt. 119) and several other pending motions (Dkts. 116, 126, 128, 133, 134, 138).

Mr. Brown is an Indiana Department of Correction ("IDOC") inmate housed at the New Castle Correctional Facility ("New Castle"). He alleges that Defendants violated his Eighth Amendment rights by discontinuing his Prilosec (also known as Omeprazole) prescription for his gastroesophageal reflux disease ("GERD") (Dkt. 26). Mr. Brown proceeds on deliberate indifference to medical need claims against Dr. Carter, NP Williams, and Ms. Jacobs, as well as *Monell* and state-law negligence claims against Centurion (Dkt. 30 at 4–5). For the reasons stated

below, summary judgment is **granted** on Defendants' motion and **denied** on Mr. Brown's cross-motion for summary judgment**.** Mr. Brown's request for leave to supplement his summary judgment motion and motion to withdraw are **granted**, his requests for preliminary injunction are **denied** and his motions to appoint counsel are **denied.** All other pending motions are **denied as moot.**

## I. <u>STANDARD OF REVIEW</u>

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in

opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

These same standards apply even when each side files a motion for summary judgment. When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.  **FACTUAL BACKGROUND**

As noted above, because the Court is reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti*, 889 F.3d at 429.

### A.  **The Parties**

The events that gave rise to this action took place when Mr. Brown, an IDOC inmate, was incarcerated at New Castle (Dkt. 26). Mr. Brown suffers from GERD and he alleges that Defendants were deliberately indifferent to his medical need when they discontinued his Prilosec prescription ( Dkt. 26 at 2–3). Pepcid and Tums are an ineffective regimen for treating Mr. Brown's GERD, and he alleges that discontinuing his Prilosec prescription was an act of cost cutting by Centurion. *Id*. at 5.

Ms. Jacobs is an administrative assistant for Centurion who works in the medical department at New Castle (Dkt. 93-1 at 1). She is not a medical professional of any kind, and she can neither examine or treat patients, nor prescribe or administer medication. *Id.* Her role is limited

to scheduling outside medical appointments for inmates. *Id.* Ms. Jacobs' only involvement with Mr. Brown's medical care was to schedule his outside appointment with a gastroenterologist at Ascension St. Vincent. *Id.* at 2. Ms. Jacobs has no recollection of interacting with Mr. Brown as it relates to this action. *Id.* at 2.

Dr. Carter is a licensed physician who previously worked at New Castle pursuant to Centurion's contract with the facility (Dkt. 93-2 at 1). In this role, Dr. Carter administered primary care services to inmates, including Mr. Brown. *Id.* at 1–2. Dr. Carter worked alongside two nurse practitioners. *Id.* at 1.

NP Williams is a licensed nurse practitioner who previously worked at New Castle pursuant to Centurion's contract with the facility (Dkt. 93-3 at 1). In this role, NP Williams was considered a "provider" who could prescribe medication, diagnose patients, and develop treatment plans. *Id.* NP Williams' role was akin to that of a physician. *Id.*

Centurion contracts with IDOC to administer health care to inmates at state facilities including New Castle (Dkt. 93-1 at 1; Dkt. 93-2 at 1; Dkt. 93-3 at 1). Centurion providers are required to use the IDOC formulary of medications pursuant to Indiana Healthcare Services Directive 2.15A (Dkt. 93-4 at 2, 4–30).

**B.    <u>GERD</u>**

At New Castle, Mr. Brown was enrolled in the Chronic Care Clinic Program, which provides for an appointment with a provider every 90 days or every 12 weeks depending on the inmate's condition (Dkt. 93-2 at 2; ). In this program, providers monitor the patient's chronic condition, renew medications, and order lab work. *Id*. If a patient's condition is stable, they may be moved to being seen every six to twelve months. *Id*. Mr. Brown was enrolled in the Chronic Care Clinic for hyperlipidemia, asthma, epilepsy, psoriasis, and GERD. *Id*.

Prilosec, Tums, and Pepcid are on the IDOC formulary. *Id.* at 2. Certain medications on the formulary require a limited prescription for the physician to periodically evaluate effectiveness of the medication and adjust the prescription accordingly. *Id.* Physicians can prescribe medications that are not on the formulary. *Id.* But these medications require additional paperwork and review by the Centurion state-wide Medical Director. *Id.* GERD is commonly known as acid reflux or heartburn (Dkt. 93-2 at 1). Certain types of foods, or the timing of food consumption, can aggravate a patient's GERD (e.g. eating right before laying down can exacerbate acid reflux symptoms). *Id.* Foods high in caffeine, oil, and fat, as well as spicy foods, can cause the patient to experience symptoms of acid reflux. *Id.*

**C.    Mr. Brown's Medical History Related to GERD**

**1.    February 28, 2022, Chronic Care Clinic visit with NP Williams**

NP Williams examined Mr. Brown in the Chronic Care Clinic on February 28, 2022 (Dkt. 93-3 at 2). During this visit, Mr. Brown's chronic conditions were hyperlipidemia, asthma, epilepsy, and psoriasis. *Id.* Mr. Brown also reported heartburn on this visit. NP Williams did not prescribe Mr. Brown anything as he already had a prescription for Omeprazole (Prilosec) that would last through March 29, 2022. *Id.* at 2–3.

**2.    June 22, 2022, visit with Dr. Carter**

Dr. Carter examined Mr. Brown at the referral of nursing staff on June 22, 2022, due to Mr. Brown's concerns about medication for his GERD (Dkt. 93-2 at 2). Mr. Brown informed Dr. Carter that he had previously been on Prilosec but was taken off it and he had bad acid reflux symptoms ever since. *Id.* During this visit, Dr. Carter ordered an H. Pylori test[1], lab work including CBC,

---

[1] H. Pylori is a common bacterium that can cause stomach/peptic ulcers (Dkt. 93-2 at 2). Dr. Carter averred that if Mr. Brown's H. Pylori test was positive, he would treat him with triple therapy and that he would follow up in two weeks. *Id.*

CMP, thyroid panel and lipid panel, as well as doubled Mr. Brown's Pepcid dose and added Tums. *Id.* Dr. Carter did not put Mr. Brown back on Prilosec because in his opinion, it should primarily be used on a short-term basis unless there is evidence that the patient has Barrett's esophagus or stomach ulcers. *Id.* at 3. Use of proton pump inhibitors ("PPIs") such as Prilosec is associated with enteric infections such as c. diff, microscopic colitis, hypergastrinemia, atrophic gastritis, intestinal colonization of multi-drug-resistant bacteria, inflammatory bowel disease, malabsorption of vitamins and minerals, decreased calcium absorption and risk of fractures, vitamin b12 malabsorption, iron malabsorption, kidney disease, and drug induced lupus. *Id.* Due to these risks, it is recommended to only use PPIs at the lowest dose and shortest duration. *Id.* Mr. Brown's H. Pylori test came back negative. *Id.*

### 3.  July 27, 2022, Chronic Care Clinic visit with NP Williams

Mr. Brown was seen for his Chronic Care Clinic exam on July 27, 2022, by NP Williams (Dkt. 93-3 at 3). He complained of daily heartburn symptoms. *Id.* Mr. Brown reported that antacids and Prilosec relieved his symptoms. *Id.* At this time, Mr. Brown was on a regimen of Pepcid and Tums. *Id.* Given his daily symptoms, NP Williams increased his Pepcid dosage to twice daily for the next 90 days. *Id.* She continued his Tums at one or two tablets, three times a day. NP Williams reviewed Mr. Brown's recent lab work and noted that his H. Pylori test was negative and up to date. NP Williams advised Mr. Brown to prop his head up when he was sleeping, which can reduce the symptoms of acid reflux. *Id.* NP Williams also advised Mr. Brown to eat at least three hours before laying down and to avoid spicy food, caffeine, chocolate, and mints. *Id.*

### 4.  September 19, 2022, Chronic Care Clinic visit with NP Williams

Mr. Brown was examined by NP Williams for a Chronic Care Clinic appointment on September 19. *Id.* at 4.. He reported having symptoms when he did not eat, and worse symptoms

when he did eat. *Id.* Mr. Brown reported vomiting and weight loss. *Id.* NP Williams continued Mr. Brown's medication regimen of Pepcid twice daily and Tums three times a day. *Id.* NP Williams also referred Mr. Brown for a consult with a gastroenterologist given his weight loss and given that his acid reflux was still uncontrolled despite the increase in Pepcid. *Id.* NP Williams again instructed Mr. Brown to avoid eating within three hours of laying down, to keep his head elevated, and to avoid foods that trigger acid reflux. *Id.* NP Williams noted that his lab results were up to date, including a negative H. Pylori test. *Id.* NP Williams instructed Mr. Brown to notify her if his symptoms worsened or if he developed trouble swallowing. *Id.*

**5.  October 17, 2022, visit with Dr. Carter**

Dr. Carter saw Mr. Brown on October 17, 2022, where Mr. Brown reported continued issues with his GERD (Dkt. 93-2 at 3). Dr. Carter noted the approval of NP Williams' referral to a gastroenterologist and advised Mr. Brown that they were awaiting the scheduling of the appointment. *Id.* Dr. Carter decided to prescribe Omeprazole/Prilosec for Mr. Brown for a duration of two months given Mr. Brown's complaint that nothing else worked to control his symptoms. *Id.* Mr. Brown had an ongoing prescription for Tums and his Pepcid prescription expired on October 24, 2022. *Id.*

**6.  March 30, 2023, outside gastroenterologist visit at Ascension St. Vincent with Non-Party Dr. Aleem**

Mr. Brown was seen by Ascension St. Vincent gastroenterologist Dr. Aleem on March 30, 2023. *Id.* The gastroenterologist recommended that Mr. Brown get an esophagagostroduodenoscopy, also known as an upper endoscopy ("EGD") (Dkt. 93-2 at 3). An EGD would evaluate the lining of Mr. Brown's esophagus, stomach, and part of the small intestine, and would show the severity of the acid reflux and any long-term damage to Mr. Brown's esophagus. *Id.* at 3–4. The EGD would also show how well Mr. Brown's acid reflux medication

was working for him. *Id.* Dr. Aleem advised Mr. Brown to avoid certain foods, eating before bed, and encouraged hm to sleep with his head elevated (Dkt. 93-6 at 8).

### 7.  April 10, 2023, follow up with NP Williams

On April 10, 2023, NP Williams examined Mr. Brown to follow up his appointment with the gastroenterologist (Dkt 93-3 at 5). NP Williams noted that he had gained almost all the weight back since the last time they had a visit. *Id.* NP Williams noted that the referral had been submitted for the EGD procedure. *Id.* NP Williams continued Mr. Brown's Pepcid twice daily and Tums while awaiting results from the EGD procedure. *Id.* NP Williams also educated Mr. Brown regarding continued lifestyle changes to manage his symptoms, including avoiding certain foods, avoiding eating before laying down, and sleeping with his head elevated. *Id.*

### 8.  Spring 2023 EDG Referral, Approval, and Mr. Brown's Refusal

On April 9, 2023, Dr. Carter submitted a referral/request for Mr. Brown's EGD procedure, and the request was approved (Dkt. 93-2 at 4). On May 15, 2023, Mr. Brown refused to have the EGD procedure recommended by the gastroenterologist and signed a refusal form. *Id.*

### 9.  July 25, 2023, prescription renewal by Dr. Carter

On July 25, 2023, Dr. Carter renewed some of Mr. Brown's chronic care medications.

### 10.  July 31, 2023, visit with NP Williams

At this visit with NP Williams, Mr. Brown reported heartburn daily and that his GERD symptoms were aggravated by eating large meals, spicy foods, and laying down (Dkt. 93-3 at 5). Mr. Brown reported that antacids, such as tums, relieved his symptoms. *Id.* NP Williams discussed his appointment with the gastroenterologist and his recommendation for an EGD. *Id.* Mr. Brown expressed his refusal to have an EGD done. *Id.* NP Williams continued Mr. Brown on Pepcid daily and Tums as needed because he said antacids relieved his symptoms. *Id.* NP Williams again

advised Mr. Brown to avoid certain foods, avoid eating before laying down, and sleeping with his head elevated. *Id.*

### 11. **September 18, 2023, Chronic care visit with NP Williams**

On September 18, 2023, NP Williams examined Mr. Brown during his Chronic Care Clinic appointment. *Id*. at 6. Mr. Brown reported continued symptoms of acid reflux but denied difficulty swallowing. *Id.* NP Williams discussed with Mr. Brown again the gastroenterologist's recommendation for an EGD, but Mr. Brown again refused. *Id.* NP Williams continued his Pepcid prescription and Tums and referred him back to the gastroenterologist given he would not agree to the EGD procedure. *Id.* NP Williams again advised Mr. Brown to avoid certain foods, avoid eating before laying down, and sleeping with his head elevated. *Id.*

### 12. **March 25, 2024, outside visit with Non-Party gastroenterologist Dr. Momah at Ascension St. Vincent**

On March 25, 2024, Dr. Momah evaluated Mr. Brown for a GERD follow up (Dkt. 93-6 at 3). Dr. Momah discussed that the EGD would provide objective evidence to support prolonged PPI use. *Id.* at 4. However, Mr. Brown declined and said he does not trust what would be done because his throat was scraped 10 years ago during an EGD. *Id.* Dr. Momah noted that Mr. Brown did not have a recent EGD done and explained that it was a low-risk procedure. Mr. Brown again declined the EGD. *Id.* Dr. Momah prescribed Prilosec 20 mg daily and told Mr. Brown to follow up if he changed his mind about the EGD. *Id.*

### D. **Commissary and Mr. Brown's Commissary Purchases**

Some medications that can be prescribed by providers are also available for purchase from the prison commissary, including Prilosec (Dkt. 93-3 at 6). At any point Mr. Brown could purchase Prilosec or antacids from the commissary *Id*. Mr. Brown maintains funds in his prison trust account to purchase items from the commissary (Dkt. 93-4 at 2). Mr. Brown routinely purchases items

from the commissary, sometimes to feed others or for raffles and game prizes in his housing unit. *Id.*; (*see also* Dkt. 99 at 7). However, during the period from January 2022 – April 2025, Mr. Brown's commissary receipts show that he did not purchase Prilosec from the commissary (Dkt. 93-4 at 2, 41–113)

### III.  DISCUSSION

Mr. Brown asserts that his pain and suffering associated with his chronic GERD was well maintained during the time that he was prescribed Prilosec—the gold standard in treating acid reflux disease—and he seeks judgment as a matter of law on his claims. He proceeds on Eighth Amendment deliberate indifference claims against Dr. Carter, NP Williams, and Ms. Jacobs, and a *Monell* and state-law negligence claim against Centurion (Dkt. 30 at 4-5). Defendants also seek judgment as a matter of law, arguing the undisputed evidence fails to support Mr. Brown's claims. The Court will address each claim in turn.

As an initial matter, Mr. Brown's Motion for Leave to Supplement his Motion for Summary Judgment, (Dkt. 119), is **granted** and the Court considers that briefing as a part of his cross-motion.

### A.    Personal Responsibility

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each Defendant is considered independently. *Id.*

Ms. Jacobs is entitled to summary judgment on the claims against her because Mr. Brown has not pointed to any evidence which would indicate that she was personally involved or had personal knowledge of the events that gave rise to his claims. The designated evidence plainly illustrates that Ms. Jacobs is an administrative assistant and had no authority to prescribe any sort

of medication to Mr. Brown (Dkt. 93-1 at 1). The only involvement Ms. Jacobs had with Mr. Brown's medical care was to schedule his outside appointment with a gastroenterologist, at the order of the provider at New Castle. *Id*.

In his briefing, Mr. Brown argues that Ms. Jacobs violated his Constitutional rights by not helping him obtain Prilosec. But Mr. Brown's briefing does not create a dispute of fact as to Ms. Jacobs' role as an administrative assistant (*See* Dkts. 98, 99, 100, 101, 104, 105, 109, 119).  Mr. Brown has pointed to no evidence from which a jury could conclude that Ms. Jacobs could have prescribed him Prilosec. *See Hill v. Meyer*, No. 21-2884, 2022 WL 1078871, at *4 (7th Cir. Apr. 11, 2022) (summary judgment for health services administrator was appropriate where plaintiff did not produce evidence that she had the authority to order specific care or reason to question the adequacy of the care the plaintiff was receiving). Accordingly, summary judgment is **granted** as to Ms. Jacobs, and the Court need not discuss claims against her further.

**B.    Deliberate Indifference to Medical Need**

Mr. Brown proceeds on Eighth Amendment deliberate indifference to medical need claims against Dr. Carter and NP Williams (Dkt. 30 at 4).

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th

11

818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Brown "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)."Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

The Court assumes for purposes of the summary judgment motion that Mr. Brown's GERD was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Brown's] health." *Dean*, 18 F.4th at 241.

Dr. Carter and NP Williams are entitled to summary judgment because they provided adequate medical care based on their professional judgment. Under the care of Dr. Carter and NP Williams, Mr. Brown intermittently received Prilosec or Pepcid and Tums to treat his GERD

12

symptoms (Dkt. 93-2 at 2–3; Dkt. 93-3 at 3–5). Dr. Carter warned Mr. Brown of the long-term effects of Prilosec and explained why he thought it was not appropriate as a long-term prescription (*See* Dkt. 93-2 at 3) (Dr. Carter describing medical risks of long-term use of proton pump inhibitors, or PPIs). Dr. Carter did not put Mr. Brown back on Prilosec because it should primarily be used on a short-term basis unless there is evidence that the patient has Barrett's esophagus or stomach ulcers. *Id.*

Due to these risks, in addition to limiting the dose and duration of Mr. Brown's PPI treatments such as Prilosec, Dr. Carter ordered an H. Pylori test and lab work to further understand Mr. Brown's GERD condition *Id.* at 2. NP Williams reviewed his lab work and noted that Mr. Brown's H. Pylori test was negative and up to date (Dkt. 93-3 at 3).

In addition to being warned about the risks of long-term PPI use, Mr. Brown was instructed by Dr. Carter, NP Williams, and outside gastroenterologists to make lifestyle changes such as avoiding certain foods and avoiding eating before laying down to manage and reduce his acid reflux symptoms. For example, NP Williams advised Mr. Brown to prop his head up when he was sleeping, which can reduce the symptoms of acid reflux *Id*. NP Williams also advised Mr. Brown to eat at least three hours before laying down and to avoid spicy food, caffeine, chocolate, and mints. *Id.* NP Williams discussed these lifestyle changes with Mr. Brown several times. *Id.* at 3–6.[2]

The designated evidence illustrates that Dr. Carter and NP Williams provided Mr. Brown with information and guidance on how to reduce his GERD symptoms while administering low-dose and minimum duration PPIs when necessary.

---

[2] Gastroenterologist Dr. Aleem also discussed these lifestyle changes (avoiding certain foods, avoiding eating before laying down, and elevating the head before bed) with Mr. Brown. (Dkt. 93-6 at 6).

Despite this, the designated evidence also reveals that at all times relevant to the Complaint, Prilosec was available for Mr. Brown to purchase from the commissary *Id*. at 6.Yet, Mr. Brown's commissary orders show that he never purchased any Prilosec during that time. (Dkt. 93-4 at 3). That is not to say Mr. Brown did not have the funds to purchase items from commissary. *Id*. at 2. Defendants point out that Mr. Brown had access to the commissary as he purchased many items during the relevant time, including items that would exacerbate his GERD symptoms. *Id*. In fact, Mr. Brown concedes that during the relevant time, he purchased commissary items to feed others, or for raffles and game prizes in his housing unit (Dkt. 99 at 7).

Moreover, while under the care of Dr. Carter and NP Williams, Mr. Brown was twice referred to a specialist outside of the facility. Specifically, he had appointments with gastroenterologists who advised Mr. Brown regarding the long-term effects of taking Prilosec and recommended an EGD to monitor for stomach ulcers or a condition called Barrett's esophagus. Dr. Carter and NP Williams, too, encouraged Mr. Brown to have an EGD done to monitor the lining of his esophagus and stomach, but Mr. Brown declined several times. While medical providers can be deliberately indifferent if they decline to follow the advice of a specialist, *see, e.g. Petties*, 836 F.3d at 729, here it appears that because he did not agree with the recommendations, Mr. Brown elected not to follow the specialists' recommendation.

The designated evidence reflects that Dr. Carter's and NP Williams' treatment decisions were based on medical judgment. Where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Dean*, 18 F.4th at 241–42.

Mr. Brown has not designated any evidence from which a reasonable jury could infer that this course of treatment was "so far afield of accepted professional standards that a jury could find

14

it was not the product of medical judgment." *Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (cleaned up). Instead, Mr. Brown only shares his disagreement with Dr. Carter's and NP Williams' decisions to discontinue his Prilosec. But disagreement with a physician's chosen course of medical treatment alone is insufficient to establish a claim of deliberate indifference. *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021). Stated differently, Mr. Brown demands specific care: to be written a Prilosec prescription, while simultaneously refusing to participate in an EGD, ordering items off commissary that aggravate his GERD symptoms, and refusing to purchase Prilosec off commissary. It is fundamental that prisoners are not entitled to demand specific care from their medical providers. *Walker v. Wexford Health Sources*, 940 F.3d 954, 965 (7th Cir. 2019).

Given the totality of Dr. Carter's and NP Williams' treatment of Mr. Brown, no reasonable jury could conclude that their actions evinced deliberate indifference. Accordingly, Defendants are entitled to summary judgment on Mr. Brown's claims that they were deliberately indifferent to his GERD symptoms.

**C.    Policy, Practice or Custom claim against Centurion**

To maintain a § 1983 claim against Centurion, Mr. Brown must show that his constitutional rights were violated by a policy or custom of Centurion. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022).

For *Monell* liability to attach, Mr. Brown must first show that he was deprived of a federal right, and then that the deprivation was caused by a Centurion custom or policy or failure to implement a needed policy. *Dean*, 18 F.4th at 235. Further, to the extent that Mr. Brown is challenging a facially lawful policy (express or implied), he must provide evidence of a "pattern

of similar constitutional violations resulting from the policy." *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). *Monell* claims challenging an unconstitutional municipal practice or custom "normally require evidence that the identified practice or custom caused multiple injuries." *Id.* (internal quotation marks and citation omitted).

Mr. Brown fails on the first prong. As previously established, he has not proved that he was deprived of a federal right when he was denied the specific healthcare treatment he demanded. Accordingly, summary judgment must be **granted** for Centurion.

## D.    <u>State-law negligence claim</u>

With Mr. Brown's constitutional claims staged for dismissal, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and citation omitted).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli*

*Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and citation omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and citation omitted).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Mr. Brown's state-law claims. Importantly, the statute of limitations is not a factor. Both federal and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998).

The Court has not expended significant resources on the pending state-law claims. The Court does not expect that the parties' discovery and briefing efforts with respect to the state law claims will go to waste. Rather, the evidence and legal research they have uncovered should be every bit as relevant in a state-court proceeding.

Further, it is not absolutely clear how the state-law claims should be resolved. While negligence does not constitute deliberate indifference, the Defendants may well have been negligent in their treatment of Mr. Brown's GERD. The outcome of Mr. Brown's negligence claim is not so obvious as to weigh in favor of the federal court retaining jurisdiction. Finally, comity always favors allowing state courts to decide issues of state law. Having resolved all claims within

its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Mr. Brown's state law negligence claim.

## IV.    MOTIONS FOR PRELIMINARY INJUNCTION

Mr. Brown has filed several motions for preliminary injunction in this matter. Mr. Brown's requests for preliminary injunction are **denied.**

To obtain preliminary injunctive relief, Mr. Brown must establish that (1) he will suffer irreparable harm; (2) his traditional legal remedies are inadequate; and (3) he has some likelihood of success on the merits. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020). Courts must be cautious when granting preliminary injunctive relief. *Tully v. Okeson*, 977 F.3d 608, 612 (7th Cir. 2020) ("A preliminary injunction is an extraordinary remedy.") (internal quotations and citation omitted); *see also Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) ("A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.") (internal quotations and citations omitted). That is particularly so when the plaintiff is requesting that the Court order the defendant to take a particular action. *Mays*, 974 F.3d at 818 ("Mandatory preliminary injunctions—'those requiring an affirmative act by the defendant'—are 'ordinarily cautiously viewed and sparingly issued.'").

Absent extraordinary circumstances, courts usually only enjoin parties that have appeared in the lawsuit. *Maddox v. Wexford Health Sources*, Inc., 528 F. App'x 669, 672 (7th Cir. 2013) (observing that "[a]n injunction, like any 'enforcement action,' may be entered only against a litigant, that is, a party that has been served and is under the jurisdiction of the district court") (quoting *Lake Shore Asset Mgmt., Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007)); *see also Audio Enters., Inc. v. B & W Loudspeakers*, 957 F.2d 406, 410 (7th Cir. 1992) (vacating preliminary injunction where defendant had not yet been served).

Because Mr. Brown has not shown success on the merits, his various requests for injunctive relief must be denied. The Court concluded that Ms. Jacobs lacked personal responsibility because she was an administrative professional and is therefore entitled to summary judgment. The Court also concluded that NP Williams and Dr. Carter were not deliberately indifferent and are therefore entitled to summary judgment as to the claims against them. Accordingly, Mr. Brown has not met his burden as to warrant any injunctive relief. For those reasons, Mr. Brown's requests for injunctive relief are **denied**.

## V.   <u>MOTIONS TO APPOINT COUNSEL</u>

Mr. Brown has filed two Motions to Appoint Counsel (Dkt. 114, 134). "Litigants in federal civil cases do not have a constitutional or statutory right to court-appointed counsel." *Walker v. Price*, 900 F.3d 933, 938 (7th Cir. 2018). Instead, 28 U.S.C. § 1915(e)(1) gives courts the authority to "request" counsel. *Mallard v. United States District Court for Southern Dist.*, 490 U.S. 296, 300 (1989). As a practical matter, there are not enough lawyers willing and qualified to accept a pro bono assignment in every pro se case. *See Watts v. Kidman*, 42 F.4th 755, 764 (7th Cir. 2022) (explaining that courts must be careful stewards of the limited resource of volunteer lawyers); *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014) ("Whether to recruit an attorney is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.").

"'When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (quoting *Pruitt v. Mote*, 503 F.3d 647, 654–655 (7th Cir. 2007)). These

two questions "must guide" the Court's determination whether to attempt to recruit counsel. *Id.* These questions require an individualized assessment of the plaintiff, the claims, and the stage of litigation. *See Pruitt*, 503 F.3d at 655–56.

The first question, whether litigants have made a reasonable attempt to secure private counsel on their own, "is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." *Eagan*, 987 F.3d at 682. Mr. Brown's motion for counsel does not describe any efforts or attempts to obtain counsel (Dkt 114 at 1–2). Accordingly, the Court finds that Mr. Brown has not made a reasonable effort to recruit counsel on his own before seeking the Court's assistance. *See Thomas v. Anderson*, 912 F.3d 971, 978 (7th Cir. 2019) (because plaintiff did not show that he tried to obtain counsel on his own or that he was precluded from doing so, the judge's denial of these requests was not an abuse of discretion). Based on this record, Mr. Brown has not satisfied the first step of demonstrating he has made reasonable attempts to obtain counsel. His Motions to Appoint Counsel are therefore **denied.**

Although the Court has denied the Motion based on the first inquiry, it briefly addresses the second inquiry. "The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims himself." *Eagan*, 987 F.3d at 682 (citing *Pruitt*, 503 F.3d at 655). "The court's competency evaluation should account for 'the plaintiff's literacy, communication skills, educational level, and litigation experience,' and, to the extent that such evidence is before the court, information 'bearing on the plaintiff's intellectual capacity and psychological history.'" *Watts*, 42 F.4th at 760 (quoting *Pruitt*, 503 F.3d at 655). "Specifically, courts should consider 'whether the difficulty of the case— factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself.'" *Eagan*, 987 F.3d at 682 (quoting *Pruitt*, 503 F.3d at 655).

"This assessment of the plaintiff's apparent competence extends beyond the trial stage of proceedings; it must include 'the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial.'" *Id.* (quoting *Pruitt,* 503 F.3d at 655).

Even assuming that Mr. Brown has made a reasonable attempt to secure private counsel on his own, he has not satisfied the second inquiry. Though Mr. Brown's Motion states that he has an average high school education, his filings have been thorough, legible, and comprehensible. Further, to the extent that Mr. Brown believes that he is unfamiliar with civil litigation, the facts supporting Mr. Brown's claims are not particularly complex and are within his personal knowledge. (*See* Dkt. 26).

The Court concludes that Mr. Brown has capably litigated the case on his own during these proceedings. Recruiting counsel for Mr. Brown prior to summary judgment would not have changed the outcome on summary judgment. Because Mr. Brown's federal claims do not survive summary judgment, the Court finds that he does not need the assistance of counsel, and his Motions to Appoint Counsel are **denied.**

## VI.    <u>CONCLUSION</u>

For the reasons explained in this Order, Mr. Brown's Motion for Leave to Supplement Motion For Summary Judgment, Dkt. [119], is **GRANTED** and his Motion to Withdraw his Motion for Sanctions, Dkt. [138] is **GRANTED. The clerk is directed** to update the docket text to reflect that Dkt. [133] is **WITHDRAWN**. Mr. Brown's Motion For Summary Judgment, Dkt. [98], is **DENIED;** his requests for Preliminary Injunction, Dkts. [67], [75], [120], [124] are **DENIED** and his Motions to Appoint Counsel, Dkts. [114], [134] are **DENIED.**

Defendants' Motion for Summary Judgment Dkt. [93], is **GRANTED.** Summary judgment is **granted** with respect to Mr. Brown's federal claims, and those claims are **dismissed with prejudice**. The court declines to exercise supplemental jurisdiction over Mr. Brown's remaining state-law claims so those claims are **dismissed without prejudice** and Mr. Brown may pursue those claims in state court.

All other pending Motions, Dkts. [116], [126], and[128], are **DENIED as moot.** Final judgment shall issue by separate entry.

**IT IS SO ORDERED.**

Date: 9/29/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

DARRELL BROWN
214818
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel